**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

FORD MOTOR COMPANY,

                    Plaintiff,                    CASE NO. 05-73860

v.                                                HON. MARIANNE O. BATTANI

UNITED STATES DEPARTMENT
OF HOMELAND SECURITY, et al.,

                    Defendants.
_____/


**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

        Before the Court is Defendants' Motion to Dismiss (Doc. # 12).  The Court heard oral

argument on April 25, 2006.  At the conclusion of the hearing, the Court took this matter

under advisement.  Upon further consideration, the Court **GRANTS** Defendants' Motion to

Dismiss.

**I.  INTRODUCTION**

        Plaintiff, Ford Motor Co. ("Ford"), filed a complaint for Declaratory Relief on October

7, 2005, challenging, among other things, the constitutionality of regulations enacted by

Customs in implementing the North American Free Trade Agreement ("NAFTA"), 19 U.S.C.

§§ 3301-3473.  According to the Complaint, the administrative recordkeeping requirements

have been administered in an arbitrary and capricious manner because they require Ford to

maintain and produce records of its foreign vendors in Mexico and/or Canada or be

assessed substantial recordkeeping penalties.  Compl. at ¶ 3.  Ford asks for a declaratory

judgment to clarify the scope of 19 U.S.C. § 1509.

1

Defendant Customs is a branch of United States Department of Homeland Security, and the Commissioner of Customs is delegated with authority and responsibility for all functions of Customs. Id. at ¶¶ 5, 6. According to Defendants, this case should be dismissed on jurisdictional grounds, procedural grounds, and discretionary grounds.

## II. FACTUAL AND STATUTORY BACKGROUND

The United States, Canada, and Mexico entered into the North American Free Trade Agreement on December 17, 1992. Under the Agreement, NAFTA Parties are required to establish and implement uniform regulations regrading the interpretation, application, and administration of the procedures found in NAFTA, Chapter Five, Articles 501-514. See 19 U.S.C. § 3332. Section 3314 authorizes Customs to enact regulations to implement the NAFTA Agreement.

In 1996, Ford imported merchandise purchased from a Mexican producer, Coclisa S.A. de C.V. ("Coclisa"). Ford claimed preferential treatment for the merchandise pursuant to the NAFTA. It claimed exemption from duty provided by the Harmonized Tariff Schedule of the United States[1] ("HTSUS") for American-made fabricated components that are returned to the United States as parts of articles assembled abroad. Compl. at ¶¶ 52-6.

---

[1]HUTUS provides that articles assembled abroad in whole or in part of fabricated components, the product of the U.S., which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting, are subject to a duty upon the full value of the imported article, less the cost or, if no charge is made, the value of such products of the United States. The rate of duty which is assessed upon the dutiable portion of the imported article is that which is applicable to the imported article as a whole under the appropriate provision of the HTSUS for such article. If that provision requires a specific or compound rate of duty, the total duties assessed on the imported article are reduced in such proportion as the cost of value of the returned U.S. components which qualify for the exemption bears to the full value of the assembled article. 19 C.F.R. §10.13.

In September 1999, Ford submitted a letter regarding a March 27, 1998 disclosure relating to that merchandise.  See Decl. of Christoper C. Smith, Deputy Assistant Chief Counsel for the Office of the Assistant Chief Counsel, El Paso, Texas, U.S. Customs and Border Protection at ¶ 3.  The Customs Special Agent in Charge ("SAIC"), Office of Investigation, El Paso, Texas, reviewed the prior disclosure and conducted the investigation into that disclosure.  Id. at ¶¶ 4, 5.  Customs eventually issued Ford a summons on January 9, 2001, demanding Ford produce records prepared and/or maintained by Coclisa, relating to the country of origin and tariff classification of component parts and materials used in NAFTA goods and sold to Ford in 1996.  Compl. at ¶ 67. Specifically, the summons requested records for over 500 entries for 1996, regarding goods produced and/or assembled in the Coclisa assembly plants and imported through El Paso.  Id. at ¶¶ 70, 71.  The summons demanded Ford's produce bills of materials ("BOMs") for the parts of automotive air conditioners, radiators, compressors, and electrical ignition parts that were produced and/or assembled in the Coclisa plants.  The summons further demanded the HTSUS, Certificates of origin (COs), manufacturers' affidavits, and other documentation to substantiate the origin of each component listed on the BOMs that did not meet the respective NAFTA rule of origin.  Id. at ¶¶ 67-71.

On June 1, 2001, Ford provided the COs for the plants for 1996.  Id. at ¶ 75.  According to Defendants, these COs were for the post-assembly, entered goods, not the component parts.  Further the COs were signed in June 2001, in violation of the requirement that a properly executed CO must be in the possession of the importer at the time a claim for preferential tariff treatment is made under NAFTA.  See 19 C.F.R. § 181.21(a).

After the investigation was completed, Customs issued a pre-penalty notice on January 28, 2002, in the amount of $41,931,997.  On October 8, 2002, Customs issued a

3

penalty notice.  On July 18, 2005, Customs issued a final decision penalizing Ford for failing

to produce the records requested, but mitigating the amount to $21,642,481.  Id. at ¶ 88.

Fords now asks the Court to declare that Customs' administration of 19 U.S.C. §

1509 is arbitrary, capricious and contrary to law; that the demanded records[2] did not have to

be maintained and produced by importers (Count I); that the (a)(1)(A) list is invalid because

it conflicts with § 181.21 of Customs Regulations (Count II); that the (a)(1)(A) list is invalid

because it conflicts with NAFTA and § 181.22 of Customs Regulations (Count III); that

Customs failed to provide notice to the importers that they were required to maintain or

produce business records relating to the country of origin and tariff classification of parts of

NAFTA goods (Count IV); that Customs may not apply recordkeeping penalties to goods

entered before 2000, the time at which Customs finalized its recordkeeping penalty

regulation (Count V); that Customs cannot use its authority to assess penalties for improper

recordkeeping to circumvent 19 U.S.C. § 1509 penalties (Count VI); that Customs cannot

assess a § 1509 penalty against an importer because it failed to comply with an

administrative summons for record (Count VII); that Customs failed to comply with APA

procedures in promulgating its mandatory recordkeeping regulations (Count VIII); and finally

that Customs' failure to advise importers of the precise records they must keep violates due

process (Count IX).

On January 11, 2006, the United States filed suit in the Western District of Texas to

_____

[2]Section 1509(a) authorizes Customs to examine records to ascertain their correctness
and to determine the liability of any person for duty, fees, taxes, fines and penalties and to
insure compliance with the laws of the US.  Entry records, known as the "(a)(1)(A) records,"
must be produced within a reasonable time after the demand is made.  Section 1509(e)
requires Customs to identify and publish a list of the records that are required to be
maintained and produced under 19 U.S.C. § 1509(a)(1)(A).

collect the civil penalty imposed against Ford.  Defendants request dismissal of this lawsuit on any or all of the various grounds discussed below.  In the alterative**,** Defendants ask the Court to transfer this action to the United States District Court for the Western District of Texas.

### III. STANDARD OF REVIEW

"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004).  Facial attacks, such as the one here, question the sufficiency of the pleadings.  United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994).  In reviewing a motion on this basis, the court must take the allegations in the complaint as true and construe them in the light most favorable to the nonmoving party.  Id.; Moir v. Cleveland Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990).

.        In reviewing a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, "accept all well-pleaded factual allegations as true, and determine whether the plaintiff can prove no set of facts in support of [its] claims that would entitle it to relief." Goad v. Mitchell, 297 F.3d 497, 500 (6th Cir. 2002).  Furthermore, "[a]lthough th[e] standard for Rule 12(b)(6) dismissals is quite liberal, the complaint must contain either direct or inferential allegations respecting the material elements and the allegations must constitute more than bare assertions of legal conclusions." Tahfs v. Proctor, 316 F.3d 584, 590 (6th Cir. 2003) (internal citations and quotations omitted).

5

**IV. ANALYSIS**

Before deciding whether this matter must be dismissed on procedural or discretionary grounds, the Court must consider the issue of subject matter jurisdiction. Subject matter jurisdiction is a "threshold matter" in all cases, and without it, "the court cannot proceed at all in any cause." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, (1998) (quoting Ex parte McCardle, 74 U.S. 506 (7 Wall. 506) (1868)). When jurisdiction "ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." McCardle, 74 U.S. 506 (7 Wall. at 514). Accordingly, the Court directs its attention to the parties' arguments addressing the existence of subject matter jurisdiction.

**A. SUBJECT MATTER JURISDICTION**

The parties dispute whether the Court has subject matter jurisdiction over Claims 1, II, III, IV, and VI. Ford asserts in its Complaint that Defendants violated the Constitution, federal statutes, and implementing regulations through its arbitrary and capricious administration of NAFTA statutes, recordkeeping statutes, and regulations. In response to those allegations, Defendants argue that any request for a declaratory judgment concerning NAFTA is barred and nonjusticiable. Further, Defendants assert that Ford's claims that the regulations are not properly implemented is barred by the six-year statute of limitation. See 28 U.S.C. § 2401(a).

**1. Does NAFTA bar the Complaint?**

The parties do not dispute that Congress expressly barred causes of action that depend upon rights and obligations imposed by NAFTA. The relevant statutory provision reads:

No **person other than the United States**–

(1) shall have any cause of action or defense under--

    (A) the Agreement or by virtue of Congressional approval thereof, or

    (B) the North American Agreement on Environmental Cooperation or the North American Agreement on Labor Cooperation; or

(2) **may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any State, or any political subdivision of a State on the ground that such action or inaction is inconsistent with the Agreement**, the North American Agreement on Environmental Cooperation, or the North American Agreement on Labor Cooperation.

19 U.S.C. § 3312 (c) (emphasis added).  Clearly, NAFTA may not be enforced in domestic courts, except through a suit brought by the United States.  Section 3312(c)(1) bars private actions, and § 3312(c)(2) precludes any action seeking to give effect to any provision of NAFTA that is inconsistent with any law of the United States.  Consequently, Ford, as a private party, may not bring a claim that challenges any action by Customs on the ground that it is inconsistent with NAFTA.  See Lopez v. United States, 309 F.Supp.2d 22 (D.C. 2004) (rejecting jurisdiction over a dispute involving a conflict between NAFTA and the state legislation barring Mexican citizens from gaining permission to operate as motor carriers in the U.S.), aff'd, 2004 WL 2616294 (D.C.Cir. 2004).  Accord Kwan v. United States, 272 F.3d 1362, 1363 (Fed. Cir. 2001) (noting that courts cannot hear claims that the U.S. is not fulfilling its treaty obligations).

In their request for dismissal, Defendants focus on those phrases in the Complaint alleging that the regulations violate NAFTA.  See e.g. Compl. at ¶¶ 99, 102, 106, 107, 121, 127, 129, 143, and 144.  Defendants are correct that this Court lacks jurisdiction to hear any claim resting entirely on those allegations.  The Complaint is not so narrowly drawn,

however, that Ford cannot proceed at all.  The gist of the parties' dispute is whether Ford, as an importer, had to maintain the records of its Mexican producer.  Ford's Complaint alleges not only violations of NAFTA, but also violations of the Administrative Procedures Act; and the declaratory relief Ford requests is not limited solely to a judgment that Custom's acted contrary to NAFTA.  None of the cases cited by Defendants shows that to the extent Ford's lawsuit challenges the regulations it is barred.  For example, the court in Canadian Lumber Trade Alliance v. United States, 425 F.Supp.2d 1321 (2006), rejected the argument that a private party is precluded from attacking the implementing regulations. Similarly, in Bestfoods v. United States,165 F.3d 1371 (1999) (holding that the Secretary of Treasury lawfully promulgated regulations and that the regulations did not violate NAFTA), the Federal Circuit allowed an action challenging a Customs' administrative ruling.

The authority cited above becomes even more persuasive when read in light of the "strong presumption that Congress intends judicial review of administrative action." Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670 (1986).  The presumption can be overcome only by a "clear and convincing evidence" that Congress intended to preclude the suit.  ABBOTT Laboratories v. Gardner, 387 U.S. 136, 141 (1967) (quoting Rusk v. Cort, 369 U.S. 367, 380 (1962)), overruled on other grounds by Califano v. Sanders, 430 U.S. 89 (1977).  That has not been shown here.  The Court therefore denies

 Defendants' request to dismiss Counts I, II, III, IV, and VI on the ground that it lacks subject matter jurisdiction over those claims.

### 2.  Are the claims timely?

The parties do not dispute that Counts II, III, IV, V, and VIII are governed by the six-year statute of limitations contained in 28 U.S.C. § 2401(a), which applies to "every civil

action commenced against the United States."; however they do dispute when the claims accrued.  Defendants contend that Ford's right of action accrued when the agency failed to follow proper procedure when promulgating the regulations, whereas Ford maintains that the claims accrued only when Defendants' interpretation of the regulations was made known.

Defendants' contention, that Ford is presumed to have proper notice as of the July 15, 1996, publication of the Interim List, 61 Fed. Reg. 36956 (July 15, 1996), ignores case law holding that an "as applied" challenge to an underlying regulation should be allowed without regard to the applicable statute of limitations. Such a challenge may be brought when an agency applies a regulation to a defendant in an enforcement proceeding, that party may challenge the validity of the regulation even if the regulation was promulgated long before.  NLRB v. Federal Labor Relations Auth., 834 F.2d 191, 195-96 (D.C.Cir. 1987). The challenger may bring a court action against the agency to review the administrative proceeding in which the agency applied the rule even if the challenger is a defendant in a court proceeding.  Commonwealth Edison Co. v. Nuclear Regulatory Comm'n, 830 F.2d 610, 613 n. 2 (7th Cir. 1987).  Accord Wind River Mining Corp. v. United States, 946 F.2d 710, 715 (9th Cir. 1991) (adopting D.C. Circuit analysis for as applied challenges).  The Court finds that Counts II, III, IV and V fall within the as applied exception.  Those causes of action accrued on July 18, 2005, when Customs issued its final decision on the penalty, well within the six-year limitation period.  Accordingly, these claims are timely filed challenges to the regulations and are not barred by the statute of limitations.

In contrast, a different analysis applies relative to Count VIII, which Ford admits challenges the manner in which Customs promulgated rules.  Ford nevertheless claims it is not untimely because Customs failed to give importers notice and the ability to comment on

9

the scope of (a)(1)(A) records.  In its Complaint, Ford advances an argument that it lacked

reasonable notice that Customs would interpret § 1509 to require an importer to maintain

and produce foreign manufacturing production documents prior to the January 28, 2002,

pre-penalty notice.  Compl. at ¶ 83.  It asserts that the interpretation was not the logical

outgrowth of the Notice of Proposed Rulemaking.  Id. at ¶¶ 44, 45.

The Court accepts these allegations as true for purposes of this motion and finds that

the facts as alleged may "postpone the commencement of the limitation period."  United

States v. Sams, 521 F.2d 421, 429 (3d Cir. 1975) (observing that "there is no specific

evidence of the legislative intent with regard to the time from which [the court] should

measure the period specified in §2401(a)"); Comanche Nation, Okla. v. United States, 393

F.Supp.2d 1196, 1208 (W.D. Okla. 2005).   Accordingly, the Court denies the request for

dismissal of Count VIII without prejudice.  Because the Court concludes that it has subject

matter jurisdiction over these claims, it turns its attention to whether the claims should be

dismissed on discretionary grounds.

### B.  JURISDICTION OVER THIS DECLARATORY JUDGMENT ACTION

The next issue the Court must decide is whether to entertain this declaratory

judgment action in light of the action pending in the Western District of Texas.  At the outset,

the Court observes that when the first filed action is one for declaratory judgment, as is the

case here, it is that court's responsibility to determine which case should go forward.  See

Daimler-Chrysler Corp. v. Gen. Motors Corp., 133 F.Supp.2d 1041, 1043-44 (N.D. Ohio

2001).  Accordingly, the Court considers the merits.

The Declaratory Judgment Act provides that , "[i]n a case of actual controversy within

its jurisdiction, . . .any court of the United States. . .may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is or

10

could be sought." 28 U.S.C. § 2201(a). The granting of such relief is discretionary. Kmart

Corp. v. Key Indus., Inc., 877 F.Supp. 1048, 1052 (E.D. Mich. 1994) (citation omitted). In

determining whether to exercise jurisdiction over a declaratory judgment "when a

subsequently-filed coercive action" by the "natural plaintiff" is pending, the district court

employs the five-factor test articulated in Aetna Cas. & Sur. Co. v. Sunshine Corp., 74 F.3d

685, 687 (6th Cir. 1996). The five factors include:

> (1)whether the judgment would settle the controversy; (2)whether the
> declaratory judgment action would serve a useful purpose in clarifying the
> legal relations at issue; (3)whether the declaratory remedy is being used
> merely for the purpose of "procedural fencing" or "to provide an arena for a
> race for res judicata"; (4)whether the use of a declaratory action would
> increase the friction between [the] federal and state courts and improperly
> encroach on state jurisdiction; and (5) whether there is an alternative remedy
> that is better or more effective.

Id. AmSouth Bank v. Dale, 386 F.3d 763, 785 (6th Cir. 2004). The Court addresses each

factor below.

### 1.  Whether the Judgment Would Settle the Controversy

Defendants maintain this factor weighs in favor of dismissing the action because a

judgment in this case will not necessarily settle the controversy. The crux of Defendants'

argument is that even if the Court were to enter a judgment that Customs cannot use its

authority to assess penalties for improper recordkeeping to circumvent its normal § 1509

penalty procedures (Compl. at ¶¶ 134-44), §1509 contains its own penalty procedures.

Therefore, Customs may penalize an importer who has failed to comply with a lawful

demand for (a)(1)(A) records. 19 U.S.C. § 1509(g). Defendants are correct, Customs can

assess the §1509 penalty against Ford, and given the current state of the pleadings, this

Court does not possess jurisdiction to determine or calculate the amount of any prospective

penalty Customs is seeking in the Western District of Texas litigation.

The Court recognizes that Defendants' arguments can only be advanced because they are not required to file a counterclaim albeit compulsory under Rule 13(a) until the party advancing the claim has served a pleading.  See Bluegrass Hosiery, Inc. v. Speizman Indus., Inc., 214 F.3d 770, 772 (6th Cir. 2000) (noting that when the "rules do not require a pleading because of pending motions, the compulsory counterclaim requirement of Rule 13(a) is inapplicable").  The Court also recognizes that if this motion is decided against Defendants several outcomes are likely, which undermine the persuasive value of their position.  First, if Ford's case is not dismissed, Defendants would have to answer the complaint and consider filing the compulsory counterclaim.  Second, Defendants are facing a possible transfer of the Texas case to Michigan.  On the other hand, the Court recognizes it is also true that Ford could advance its position by way of affirmative defenses in the Texas litigation.

At this point in the litigation, it is impossible for the Court to reach a definitive finding on whether this action will clarify the legal relations between the parties.  Therefore, the

Court concludes that this first factor does not weigh heavily in favor of or against the continuation of this declaratory judgment action

### 2.  Whether the Declaratory Judgment Action Would Serve a Useful Purpose in Clarifying the Legal Relations at Issue

Under longstanding authority, "when a putative tortfeasor sues an injured party for a declaration of nonliability, courts will decline to hear the action in favor of a subsequently-filed coercive action by the 'natural plaintiff.'"  See 10B Wright, Miller & Kane § 2765 at 638 (3d ed. 1998).  An exception to the general rule has been made "when some additional harm, not merely waiting for the natural plaintiff to sue, will befall the declaratory

12

plaintiff in the meantime." AmSouth, 386 F.3d at 786. The appellate court provided several examples warranting application of the exception. The first example is illustrated by a party who wants to initiate a marketing campaign, "but has been threatened with suit over trademark infringement." Id. The court observed that the party could employ the Declaratory Judgment Act to "seek a judgment that it is not infringing that trademark, thereby allowing it to proceed without the fear of incurring further loss." Id. The court included a second illustration involving a situation where a party engaged in an ongoing contractual relationship has been accused of breach. That party could use the Declaratory Judgment Act to "have the contract definitively interpreted, which would then afford that party the opportunity to conform its behavior to the terms of the agreement and stop the potential accrual of damages." Id.

Although the situation at hand does not fit precisely into either illustration, there is no evidence suggesting that Ford will suffer additional harm. Ford asserts only that it faces a Hobson's choice of compliance and payment of the penalty or testing the interpretation by refusing to comply and defending against an enforcement action. It concludes that this is the very thing the Declaratory Judgment Act was intended to address.

Despite Ford's predicament, the Court finds that Ford incurred no further loss while settlement negotiations continued, and at the time it filed its declaratory judgment action, it merely suffered the "uncertainty" of awaiting suit on past behavior, which in and of itself is not sufficient for the "invocation of the federal power to issue a declaratory judgment." Id. at 787. Accord Int'l Ass'n of Entrepreneurs v. Angoff, 58 F.3d 1266, 1270 (8th Cir. 1995) ("[T]he Declaratory Judgment Act is not to be used to bring to the federal courts an affirmative defense which can be asserted in a pending state action."). The Court declines to distinguish the cases cited above on the ground that Ford is not a tortfeasor or that none

13

of the judicial decisions relied upon by Defendants in supporting dismissal involved federal government regulatory or enforcement actions.  Neither distinction places this dispute outside the policy considerations giving rise to the doctrine: "Where a pending coercive action, filed by the natural plaintiff, would encompass all the issues in the declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is unjustified. This is true whatever the nature of the coercive action underlying the declaratory action--the important distinction in the case law is between situations where some uncertainty beyond the possibility of litigation exists (i.e., trademark infringement) and those where the injury is already complete."   Id.

Although Ford has an ongoing "relationship" with Defendants, in this case Defendants do not allege any current or ongoing wrongdoing on the part of the Ford that would require immediate clarification of the parties' respective rights.  Despite Ford's contention that litigation strategies might stymie its effort to have these claims resolved on the merits, this is not a situation in which a declaratory plaintiff will suffer injury unless legal relations are clarified.  See e.g. Tempco Elec. Heater Corp. v. Omega Eng'g, Inc., 819 F.2d 746, 749-50 (7th Cir. 1987) (where declaratory defendant "promptly filed suit to enforce its [underlying] claim. . .a declaratory judgment would serve no useful purpose and was properly denied").  In this circuit, the existence of a coercive action is important to any determination that a declaratory action would serve no useful purpose. See, e.g., Albie's Foods, Inc. v. Menusaver, Inc., 170 F.Supp.2d 736, 740 (E.D. Mich. 2001) (relying on Tempco in deferring to a subsequently-filed coercive action, noting that invocation of coercive remedy will "help sharpen and refine the issues to be decided"); Pakideh v. Ahadi, 99 F.Supp.2d 805, 807-09 (E.D. Mich. 2000) (dismissing anticipatory breach of contract

14

declaratory judgment action in favor of coercive action pending in other federal district court after removal). Accordingly, the Court finds this factor favors dismissal.

### 3. Whether the Declaratory Remedy is Being Used Merely for the Purpose of Procedural Fencing or to Provide an Arena for a Race for Res Judicata

The general rule in resolving where an action should be litigated is the first to file rule. Under the rule, which is discretionary, the case that is filed first takes priority over a subsequently filed lawsuit. Barber-Greene Co. v. Glaw-Knox Co., 239 F.2d 774, 778 (6th Cir. 1957). Exceptions to the rule have been made in circumstances akin to the one here. See Albie's Foods, 170 F.Supp.2d at 736 (dismissing declaratory judgment action after an action seeking coercive relief was filed). Specifically, an exception is made when a declaratory plaintiff files suit mere days or weeks before the coercive suits filed by a "natural plaintiff," particularly when the declaratory plaintiff seems to have done so for the purpose of acquiring a favorable forum. Allowing declaratory actions in these situations acts as a deterrent to settlement negotiations and "encourage[s] races to the courthouse, as potential plaintiffs must file before approaching defendants for settlement negotiations, under pain of a declaratory suit." AmSouth Bank, 386 F.3d at 788.

Defendants maintain that is what happened here, and the Court agrees. The record reveals that Ford filed this action in anticipation of Custom's pending recordkeeping penalty litigation and sought a more favorable forum. The Court is not persuaded to the contrary by Ford's assertion that it did not file suit in this district to obtain a more favorable forum. Although Ford may not have gained a tactical advantage filling in Michigan inasmuch as the same law will be applied in either forum, it is clear that this forum, where Ford is headquartered, provides it a more convenient location. Moreover, the Court rejects Ford's characterization that Defendants selected Texas as a geographically inconvenient place for

15

Ford to litigate the dispute.   Although Defendants filed their enforcement action in El Paso, Texas, which undoubtedly is less convenient for Ford, Defendants did not randomly select an inconvenient forum.  All of Defendants' conduct relative to the dispute took place in El Paso.  Defendants filed in the place where the goods entered into the United States, where its employees and attorneys are located, where the summons was issued, and where the negotiations took place.  <u>See</u> Decl. of Christopher Smith.  There is a connection beyond any attempt to inconvenience Ford.

Nor does Ford raise any viable basis for rejecting the assertion that this lawsuit was anticipatory.  Ford filed the action over a decade after the implementation of the regulations about which it complains and after almost three years of discussion and negotiation with Customs about the penalty.  There is no dispute that Ford knew that if it did not agree to pay a portion of the mitigated penalty amount of $21,642,481, Customs intend to file a penalty action in Texas.  Also, Ford presumably knew that the statute of limitations would have expired on February 8, 2006.  More importantly, this Court agrees with Defendants that the September 21, 2005, letter shows that the parties were engaged in good faith negotiations relative to the dispute even as Ford filed this action.  <u>See</u>  <u>N. Shore Gas Co. v. Salomon Inc.</u>, 152 F.3d 642, 647 (7th Cir. 1998) (where settlement negotiations had reached acknowledged impasse, declaratory judgment filed one month after last contact between parties was not "racing to the courthouse"); <u>Kmart Corp. v. Key Indus., Inc.</u>, 877 F. Supp. 1048, 1052-55 (E.D. Mich. 1994) (finding declaratory judgment appropriate; key consideration is whether the declaratory plaintiff "misled the defendant into believing that their dispute could be resolved amicably so that the plaintiff could win the race to the courthouse").

Finally, this lawsuit clearly raises what would be affirmative defenses to the

16

underlying penalty action. Ford can litigate the claims it makes in this declaratory judgment action in Texas; the claims in essence are affirmative defenses to the penalties Customs seeks to impose. Consequently, a decision in this declaratory judgment action would effectively deny Customs its legitimate choice of the forum for its coercive action. See Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc., No. 00-3183, 2001 WL 897452, *4 (6th Cir. July 31, 2001) (where declaratory plaintiffs filed suit after requesting an extension to respond to settlement demand, one day before extension's expiration, a "finding of bad faith is overwhelmingly supported in the record"); Nortek, Inc. v. Molnar, 36 F.Supp.2d 63, 70 (D.R.I. 1999) (where declaratory plaintiff asked for letter outlining legal reasoning and promised to respond, then filed action prior to responding to letter, party "certainly shopped for a forum," and court therefore declined jurisdiction over first-filed action); Columbia Pictures Indus., Inc. v. Schneider, 435 F.Supp. 742, 747-48 (S.D.N.Y. 1977) (allowing an earlier declaratory action to proceed "would create disincentives to responsible litigation," and instead, "[p]otential plaintiffs should be encouraged to attempt settlement discussions (in good faith and with dispatch) prior to filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation in a district of its own choosing before plaintiff files an already drafted complaint."). Of all the factors to consider, the Court, in its discretion, finds that the strength of this one alone warrants dismissal of the declaratory judgment action. "[W]here a putative defendant files a declaratory action whose only purpose is to defeat liability in a subsequent coercive suit, no real value is served by the declaratory judgment except to guarantee to the declaratory plaintiff her choice of forum--a guarantee that cannot be given consonant with the policy underlying the Declaratory Judgment Act." AmSouth, 386 F.3d at 788 (noting that the Act "is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a

17

plaintiff by winning the proverbial race to the courthouse") (internal quotation marks and citation omitted).  The Court observes that allowing this action to proceed would not serve the policies sought to be advanced by the Declaratory Judgment Act.  See NGS Am., Inc. v. Jefferson, 218 F.3d 519, 523 (6th Cir. 2000) ("[A] rule permitting [this sort of declaratory] action could frustrate a plaintiff's choice of forum and encourage forum shopping, races to the courthouse, needless litigation occasioning waste of judicial resources, delay in the resolution of controversies, and misuse of judicial process to harass an opponent in litigation, irrespective of the actual motives of the declaratory plaintiff").

**4.  Whether allowing the action would cause friction between state and federal courts**

This factor is not relevant to the analysis in this case.

**5.  Whether there is an alternative remedy that is better or more effective**

The Court finds that the Western District of Texas is well suited to flesh out any issues relating to the penalty assessed against Ford.  Moreover, the § 1509 action authorizes the court to calculate the amount of the penalty and enter judgment should Defendants prevail.  These advantages are tempered by Ford's legitimate concern that the multitude of affirmative defenses it can raise in the Texas enforcement action offer that court the opportunity to resolve the parties' dispute on grounds other than those raised in its declaratory judgment action.  Nevertheless, this factor weighs slightly in favor of Defendants.

In sum, two factors weight heavily in favor of Defendants:  the possibility that the declaratory judgment would serve no useful purpose; and Ford use of this action for the purpose of procedural fencing.  Both favor a conclusion that the Court should decline

18

jurisdiction over this declaratory action, with no factors weighing heavily in favor of proceeding with the declaratory-judgment action. <u>AmSouth Bank</u>, 386 F.3d at 785-792.

## V.  CONCLUSION

For the reasons stated above, the Court **DECLINES** to exercise jurisdiction over this declaratory judgment action.  Accordingly, the motion is **GRANTED** on that ground.

**IT IS SO ORDERED**.


<u>s/Marianne O. Battani</u>
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: <u>August 23, 2006</u>


## CERTIFICATE OF SERVICE

A copy of this Order was mailed and/or electronically filed to Richard H. Abbey, Thomas W. Cranmer, Robert B. Silverman, Paulsen K. Vandervert, and David S. Silverbrand on this date.


<u>s/Bernadette M. Thebolt</u>
Deputy Clerk